J-S20042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| BENARD LAQUAIN JACKSON | : | |
| | : | |
| Appellant | : | No. 1117 WDA 2021 |

Appeal from the Judgment of Sentence Entered May 3, 2021
In the Court of Common Pleas of Beaver County
Criminal Division at No(s):  CP-04-CR-0000875-2019

BEFORE:  NICHOLS, J., MURRAY, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: SEPTEMBER 1, 2022**

Appellant, Benard Laquain Jackson, appeals from the judgment of sentence entered in the Beaver County Court of Common Pleas, following his jury trial convictions for two (2) counts each of aggravated assault and endangering the welfare of children ("EWOC") and one (1) count each of simple assault and recklessly endangering another person ("REAP").[1]  We affirm.

The relevant facts and procedural history of this appeal are as follows. On March 20, 2019, Appellant took his eight-month-old daughter ("Victim") to the emergency room after she suffered second-degree burns on her head and groin.  Appellant informed hospital personnel that he was bathing Victim in a

---

[1] 18 Pa.C.S.A. §§ 2702(a)(8), (9), 4304(a)(1), 2701(a)(1), and 2705, respectively.

shower at his residence. Appellant left Victim unattended in the shower stall while he checked on laundry. When he returned to the shower stall, Appellant purported to have discovered Victim's injuries. Doctors determined that Victim's injuries were inconsistent with Appellant's story, and hospital personnel notified police about the incident.

On April 4, 2019, the Commonwealth filed a criminal complaint charging Appellant with various offenses against Victim. Prior to trial, Appellant informed the Commonwealth that he intended to present testimony from Dr. John Abraham, Ph.D., an expert in the field of mechanical engineering. Appellant sought to have Dr. Abraham "connect exposure temperatures with burn injury severity." (Affidavit of Proposed Expert, filed 11/10/20, at Ex. A). On October 28, 2020, the Commonwealth filed a motion *in limine*. While the Commonwealth did not object to Dr. Abraham testifying about areas within his expertise, such as fluid flow and heat, it wanted to preclude the expert from testifying about Victim's medical treatment and the child abuse findings. (**See** Motion *In Limine*, filed 10/28/20, at ¶¶15-16). Ultimately, the court granted the motion *in limine* in part:

> Defense Expert John Abraham is precluded from testifying about areas outside his education and expertise as a mechanical engineer. Specifically, he is precluded from testifying about: child development, child abuse findings, medical diagnosis and opinions, medical treatment, pediatric diagnosis or treatment.
>
> However, Defense Expert John Abraham may be permitted to offer opinion testimony with respect to hot water transference and exposure with consideration given to

> temperature, duration and flow factors as they relate to burn injuries….

(Order, entered 1/21/21).

Appellant proceeded to a jury trial on March 5, 2021. At the conclusion of the trial, the jury convicted Appellant of two counts each of aggravated assault and EWOC and one count each of simple assault and REAP. The jury found Appellant not guilty of an additional count of aggravated assault. On May 3, 2021, the court sentenced Appellant to an aggregate term of sixty-six (66) to one hundred thirty-two (132) months' imprisonment. Appellant timely filed a post-sentence motion on May 12, 2021. In it, Appellant argued that the Commonwealth presented insufficient evidence to support his convictions. Appellant also argued that the court improperly limited the scope of Dr. Abraham's testimony. On May 14, 2021, the court scheduled argument and ordered the parties to submit briefs on the post-sentence issues. After receiving the briefs, the court denied Appellant's post-sentence motion on August 18, 2021.

Appellant timely filed a notice of appeal on September 16, 2021. On September 21, 2021, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant timely filed his Rule 1925(b) statement on October 5, 2021.

Appellant now raises three issues for this Court's review:

> Whether the Commonwealth presented sufficient evidence to prove beyond a reasonable doubt that Appellant acted with the necessary intent to prove him guilty beyond a

reasonable doubt of aggravated assault, simple assault, and [REAP]?

Whether the Commonwealth presented sufficient evidence to prove beyond a reasonable doubt that Appellant acted with the necessary intent to prove him guilty beyond a reasonable doubt of [EWOC]?

Whether the trial court abused its discretion in prohibiting defense expert Dr. John Abraham from testifying about burn patterns.

(Appellant's Brief at 7).

In his first two issues, Appellant contends that the offenses of aggravated assault and simple assault require the Commonwealth to prove that a defendant acted intentionally, knowingly, or recklessly. Likewise, the offense of REAP requires the Commonwealth to prove that a defendant acted recklessly. Appellant insists that the Commonwealth did not prove that he possessed the requisite *mens rea* in the instant case. Appellant emphasizes that he "sought medical attention immediately by way of taking the child to the hospital directly." (***Id.*** at 20). Appellant also maintains that the "testimony at trial shows that [he] was not told that the water in the shower could get extremely hot when another water appliance was used, such as a washing machine." (***Id.***)

Regarding the offense of EWOC, Appellant claims that the Commonwealth must prove that a defendant knowingly endangered the welfare of a child by violating a duty of care, protection, or support. Again, Appellant insists that the Commonwealth did not prove that he possessed the

- 4 -

requisite intent. Further, Appellant argues that the Commonwealth failed to prove that he "knowingly put his daughter in a situation which endangered her physical or psychological welfare." (*Id.* at 24). Absent more, Appellant concludes that the Commonwealth presented insufficient evidence to support the convictions. We disagree.

Our standard of review for sufficiency claims is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Tucker*, 143 A.3d 955, 964 (Pa.Super. 2016), *appeal denied*, 641 Pa. 63, 165 A.3d 895 (2017) (quoting *Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super. 2011)).

The Crimes Code defines simple assault in relevant part as follows:

**§ 2701.  Simple assault**

**(a) Offense defined.**—Except as provided under section 2702 (relating to aggravated assault), a person is guilty of assault if he:

(1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another[.]

18 Pa.C.S.A. § 2701(a)(1).

The Crimes Codes defines aggravated assault in relevant part as follows:

**§ 2702.  Aggravated assault**

**(a) Offense defined.**—A person is guilty of aggravated assault if he:

\* \* \*

(8) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to a child less than six years of age, by a person 18 years of age or older; or

(9) attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a child less than 13 years of age, by a person 18 years of age or older.

18 Pa.C.S.A. § 2702(a)(8), (9).  To show an attempt to cause bodily injury, the Commonwealth must establish the defendant acted with specific intent to cause bodily injury.  ***Commonwealth v. Matthew***, 589 Pa. 487, 491-92, 909 A.2d 1254, 1257 (2006).  A person acts with intent with respect to a material element of the crime, if "it is his conscious object to engage in conduct of that nature or to cause such a result[.]"  18 Pa.C.S.A. § 302(b)(1)(i).

The Crimes Code defines REAP in relevant part as follows:

**§ 2705.  Recklessly endangering another person**

A person commits a misdemeanor of the second degree if

- 6 -

he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S.A. § 2705.

Thus, the crime requires (1) a *mens rea* [of] recklessness, (2) an *actus reus* [of] some "conduct," (3) causation "which places," and (4) the achievement of a particular result "danger," to another person, of death or serious bodily injury.

***Commonwealth v. Reynolds***, 835 A.2d 720, 727 (Pa.Super. 2003) (quoting

***Commonwealth v. Trowbridge***, 395 A.2d 1337, 1340 (Pa.Super. 1978)).

The *mens rea* required for REAP is "a conscious disregard of a known risk of death or great bodily harm to another person." ***Commonwealth v. Klein***, 795 A.2d 424, 427-28 (Pa.Super. 2002) (citation omitted). "Serious bodily injury" is "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

The Crimes Code defines EWOC in relevant part as follows:

### § 4304.  Endangering welfare of children

**(a)  Offense defined.**—

(1)    A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a)(1).  The Commonwealth must prove the following to

sustain an EWOC conviction: (1) the accused was aware of his duty to protect the child; (2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. **Commonwealth v. Bryant**, 57 A.3d 191, 197 (Pa.Super. 2012).

Instantly, the Commonwealth presented testimony from various physicians who opined that Victim's injuries were not accidental. The trial court accurately summarized this testimony as follows:

> Dr. Jenny Ziembicki, director of the Burn Unit at UPMC Mercy Hospital, treated [Victim] when she was transferred there on March 20, 2019. The history given at Mercy was that "while the patient was being bathed, a washing machine was being used, which turned water hot, scalding the child, and it wasn't noted during the course of bathing the child that anything was unusual until the child was being dried off at which time they noted peeling skin by the father." [Victim] presented with second degree (or partial thickness) burns on the genital area and the entirety of the face. Dr. Ziembicki stated that [Victim] suffered no burns on any other part of her body.
>
> Dr. Ziembicki testified that it is part of her job to determine the mechanism that causes a burn and whether burns are accidental or intentional. She stated that accidental burns are "much more likely to be a part of face, not the whole face." [Victim's] face burn "does not look like an accidental burn" because it's too "well demarcated" and had "no spill lines." An accidental spill burn would result in an asymmetrical burn pattern and "areas of different depths." Wherever a spill "hits first tends to be the deepest area, and then as the water cools, it's less deep. So you get different depths of burn, you get irregular borders and you get asymmetry." [Victim's] burn could not be from a shower because "[t]here's absolutely no way to get the entirety of

your head without getting your chest or back. There's no way to get demarcated lines, and you would absolutely expect burns on the, on the chest or the back, and you would expect different depths of burns. There's zero spill marks here."

Dr. Ziembicki stated that [Victim's] genital burns were "localized to the groin without affecting the greater portions of the leg." She found that unusual because "skinfolds and groin are protected areas" and are usually "one of the last areas to be burned." The genital burns could not have come from a spill, shower, or bathtub because they were "so well demarcated to the groin. So you would expect more extensive buttocks burns, upper thigh burns and lower leg burns depending on how they were sitting." If [Victim] had been seated at the time, there "should be more burns on the buttocks and as well on the legs."

Dr. Ziembicki testified that she never had another case of "isolated head and genital burns together" and stated that [Victim's] case "does not look like a shower burn" or burns that a child would get from being seated in a bathtub. Rather, she stated, the injuries were "very consistent" with an immersion burn. "[W]hen you're placed in hot water and you can't naturally withdraw … you get well demarcated lines." [Victim] suffered burns to 16 percent of her total body surface area, but "[e]ven for people that come in with 80, 90 percent burns, the groin and the scalp are usually spared, so this is a highly unusual pattern of burn injury." Dr. Ziembicki testified that [Victim's] burns were consistent with the child's head being dunked in hot water and, in a separate act, her bottom being dunked in hot water.

Dr. Ziembicki testified that the injury would be immediately apparent and would result in immediate changes to [Victim's] appearance. The burns would cause visible and obvious pain and would immediately prompt [Victim] to scream and cry. Until the burns healed, [Victim] would suffer extreme pain, including pain when she opened her mouth, when she blinked, and even when air hit the affected skin. She would also suffer excruciating pain every time [she] urinated or had a bowel movement. The injuries may result in permanent scarring, permanent skin color changes, lifelong pain, and significant psychiatric problems.

- 9 -

"[F]orever she will be scarred on her face. She will have to face that for the rest of her life and other people's opinion of her when they look at her."

Dr. Ziembicki testified that the Children's Hospital Child Advocacy Center was consulted because [Victim's] "appearance and her burn wounds simply did not fit with the story that was given." …

Dr. Jennifer Wolford, attending physician in the Division of Child Advocacy at Children's Hospital, testified that she specializes in determining whether children's injuries are accidental or nonaccidental and whether child abuse or maltreatment is involved. She stated that her division reviews all children's burn cases from the UPCM Mercy Burn Unit, and about ten to twenty percent are deemed nonaccidental. Dr. Wolford evaluated [Victim] at Mercy on March 20, 2019 and assessed that her burns "were the cause of direct inflicted injury and these are abusive burns." On that date, Dr. Wolford spoke with [Victim's] mother … who stated that [Appellant] "was home alone with the child and she had a soiling accident so he put her in the shower and left her there and then put her clothes in the washer, which raised the water temperature in the shower. He then washed her up, and it was when he was drying her, he noticed her skin was sloughing off. I asked for clarification, and at that time, the mother called the father and stated to me that the father said she did not cry, that he was able to wash her off … finish the shower and then dry her off and that's when he noticed something was wrong."

Dr. Wolford reviewed medical records in which inconsistent versions of the incident were reported prior to her involvement. At the Heritage Valley Sewickley emergency room, it was recorded that [Appellant] "stated he was getting ready to give her [a] bath and turned on hot water that came out of the shower instead of the faucet and sprayed all over…. [S]he immediately cried. He tried to dry her off. Her skin began to slough off." Dr. David Thomas, attending physician at Heritage Valley Sewickley, noted that the burns were "sustained while father was washing her in the bathtub. Per the mother and father, he did not realize the temperature. The story seems to be inconsistent, and there is a concern for nonaccidental trauma." At the Mercy

emergency room, Physician's Assistant Kathleen Ross recorded: "Father notes he was bathing the child in the bathtub as well as doing the wash when the hot water came on and accidentally burned the patient…. It started immediately." That note seemed to include the suggestion that [Victim] may have turned the water on herself. Also at Mercy, Dr. Rebecca McNutt noted that [Appellant] "states he was bathing the child and didn't realize how hot the water was and did not notice the burns until he was drying her off…. The story is very concerning and seems inconsistent." A social worker who spoke with [Appellant] at Mercy recorded: "Father reports to the ED staff he just recently got a new hot water [heater] and was unaware of the temperature settings…. Father was running the washing machine at the same time he was bathing the child in the tub. Child was sitting in the tub, and father turned on the faucet. It is not clear whether the child protested at all."

Dr. Wolford testified that, in her professional experience, "when large events of injury happen, when it's a very clear accidental history, the details never change, and in fact, they're often seared into our memories, and we recall them. It is always concerning to us as a pediatrician when a child is there with life-threatening injuries and the details are shifting." With accidental injuries, "the details are there and they're the same because all details are brought forward in order to get the child the care that they need. So as a child abuse pediatrician, shifting or changing vague histories raise concerns to us…."

Reviewing photos of [Victim's] burn injuries, Dr. Wolford testified that "an irregular splatter pattern" is "one of the hallmarks of accidental events. This somehow involves the entire head" and "is most consistent … with submerging a head in burning water." **She stated that "[t]his is the result of intentionally … burning a head and also pouring or submerging into hot water the genital area. This is intentionally inflicted to these two areas."** She explained that "it is not uncommon that we hear" of injuries inflicted on a child "after a toilet accident … that the baby got dirty and someone is frustrated…." As to [Victim's] genital burns, Dr. Wolford opined that "this area was dirty and it was dipped in hot water as a punitive cleansing."

> Dr. Wolford stated that the burns would cause extraordinary pain and that the child would be immediately crying. A claim that the child had little audible reaction "makes no sense," and the notion that [Appellant] didn't realize the child was burned until he was drying her off "is not possible."
>
> \* \* \*
>
> Dr. Wolford concluded that "there is no possible explanation of an accidental event that caused this gravity of burns to this child in an accidental method. This was inflicted violently on this child. This is child abuse."

(Trial Court Opinion, filed 8/18/21, at 2-7) (internal record citations omitted) (emphasis added).

Here, the testimony from Victim's treating physicians established that Victim did not suffer her injuries due to an accident. The jury was free to credit the testimony from Dr. Ziembicki and Dr. Wolford, which established that Appellant knowingly inflicted serious bodily injuries on Victim. *See Tucker, supra*. Viewing this testimony in the light most favorable to the Commonwealth as verdict winner, sufficient evidence demonstrated that Appellant acted with the requisite intent for each of the offenses at issue. *See id. See also Matthew, supra*; *Bryant, supra*; *Reynolds, supra*. Accordingly, Appellant is not entitled to relief on his first two claims.

In his third issue, Appellant acknowledges that the court permitted Dr. Abraham to opine "that it was entirely possible that [Victim's] burns happened in a way consistent with Appellant's story[.]" (Appellant's Brief at 26-27). Appellant complains, however, that the court did not permit Dr. Abraham to

- 12 -

testify "about how hot water would cause certain burn patterns and burn depths according to the temperature and flow of the water." (*Id.* at 25). Appellant emphasizes that Dr. Abraham formulated his opinion after reviewing photos of Victim, examining her medical records, testing the temperature of the water in Appellant's basement, and testing the flow of water in Appellant's shower. Appellant maintains that additional expert testimony regarding the characteristics of the burn patterns on Victim's skin would have helped the jury better understand the evidence at issue. Appellant concludes that the court committed reversible error by limiting the scope of Dr. Abraham's testimony. We disagree.

This Court's standard of review for issues regarding the admissibility of evidence is well settled:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court ... [and] we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. [I]f in reaching a conclusion the trial court [overrides] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Belknap*, 105 A.3d 7, 9-10 (Pa.Super. 2014), *appeal denied*, 632 Pa. 667, 117 A.3d 294 (2015) (internal citations and quotation marks omitted).

"Relevance is the threshold for admissibility of evidence."

- 13 -

***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa.Super. 2015) (*en banc*),

*appeal denied*, 633 Pa. 787, 128 A.3d 220 (2015).

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or tends to support a reasonable inference or proposition regarding a material fact. Relevant evidence may nevertheless be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

***Commonwealth v. Danzey***, 210 A.3d 333, 342 (Pa.Super. 2019), *appeal*

*denied*, 656 Pa. 9, 219 A.3d 597 (2019) (internal quotation marks omitted).

Pennsylvania Rule of Evidence 702 provides:

> **Rule 702. Testimony by Expert Witnesses**
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c)    the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

Instantly, the court analyzed the scope of Dr. Abraham's testimony as

follows:

> The [c]ourt notes that Dr. Abraham was permitted to testify

fully as to four of the five opinions he rendered in his expert report. He disputed the tests performed by [Detective Sergeant] Roberts,[2] testified that the residence's shower system produced extremely hot water that made injury likely, and confirmed that the water temperature was hotter than safety standards recommended. Most significantly, he was permitted to testify that his findings were consistent with [Appellant's] version of the incident, and that it was reasonable to expect someone to be burned in that shower.

The opinions in Dr. Abraham's expert report which he was precluded from stating at trial were his criticisms of Dr. Wolford's medical opinions derived from her treatment of [Victim]. The [c]ourt found that he lacked the medical expertise to contradict the findings of [Victim's] treating physicians….

(Trial Court Opinion at 19) (internal record citations omitted).

Our review of the records confirms that the court permitted Dr. Abraham to endorse Appellant's explanation:

_____

[2] At trial, Detective Sergeant Steven Roberts of the Aliquippa Police Department testified regarding his investigation into the incident, which included an inspection of the water tank and bathroom at Appellant's residence. (*See* N.T. Trial, 3/10/21, at 20-34). During the inspection, Detective Sergeant Roberts used an "infrared thermometer" to measure the temperature of the running water in Appellant's bathroom. (*Id.* at 25). Dr. Abraham subsequently disputed Detective Sergeant Roberts's methods:

Well, specifically I had seen the officer report, and there was some videos of how [Detective Sergeant] Roberts attempted to measure water, and I disagreed with those. I felt they were incorrect.

And so I traveled to the premises to perform my own experimental investigation of the plumbing, the shower, and the temperatures.

(N.T. Trial, 3/11/21, at 91).

[DEFENSE COUNSEL]: Okay. Now, after investigating the plumbing system, measuring the water temperatures in [Appellant's residence], what is your opinion after investigating the layout and … what you measured?

[WITNESS]: My opinion is that the piping and plumbing layout is consistent with the story of [Appellant].

[DEFENSE COUNSEL]: How so?

[WITNESS]: The, the piping and plumbing layout is dangerous. It is surprisingly dangerous, because not only is it too hot, but you get a big pressure change. And those two things make it very dangerous for anyone to shower in that shower, and it could cause scald burns.

(N.T. Trial, 3/11/21, at 125-26).

To the extent the court did not permit Dr. Abraham to provide additional testimony about Victim's diagnoses and injuries, we agree that such topics fell outside the realm of Dr. Abraham's "knowledge, skill, experience, training, or education." **See** Pa.R.E. 702. On this record, we cannot say that the court's evidentiary ruling resulted from the misapplication of the law, the exercise of manifestly unreasonable judgment, or bias, prejudice, ill-will or partiality. **See Belknap, supra**. Because the court did not abuse its discretion in limiting the scope of Dr. Abraham's testimony, Appellant is not entitled to relief on his third claim. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/1/2022